2021 IL App (1st) 192228-U

No. 1-19-2228

Order filed June 30, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 779601 |
| | ) | |
| DENNIS GAYTAN, | ) | Honorable |
| | ) | Steven Jay Rosenblum, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justice Connors concurred in the judgment.
Justice Harris dissented.

**ORDER**

¶ 1    *Held*: We reversed defendant's conviction where the trial court erred in denying defendant's motion to suppress where defendant was subject to an unconstitutional warrantless search.

¶ 2    Following a bench trial, defendant Dennis Gaytan was convicted of aggravated unlawful use of a weapon (AUUW) and sentenced to one year imprisonment and one year of mandatory supervised release (MSR). On appeal, defendant contends that his motion to suppress should have

been granted because: (1) his detention by the officer was an unconstitutional seizure, (2) the officer's pat-down was an unconstitutional search, and (3) the gun should have been suppressed. He requests that this court reverse his conviction and remand for a new suppression hearing. For the reasons that follow, we reverse the denial of defendant's motion to suppress and because the State has no basis for the charge without the evidence that the trial court should have suppressed, we reverse defendant's conviction and vacate his sentence.

¶ 3                          BACKGROUND

¶ 4                          1. Motion to Suppress

¶ 5     Prior to trial, defendant filed a motion to suppress a gun that was recovered during a pat-down search by police on October 22, 2018. The motion stated that defendant was arrested on May 20, 2018, and charged with AUUW after a gun was found on his person. Defendant argued that: (1) no search or arrest warrant existed that justified the search and subsequent seizure; (2) no exigent circumstances existed that justified the warrantless search and seizure; (3) he did not consent to the search or seizure; (4) the search and seizure was not incident to or contemporaneous with a valid arrest; and (4) he was questioned without first being given *Miranda* warnings.

¶ 6     A hearing on defendant's motion was held on November 8, 2018. Defendant testified at the hearing that on May 20, 2018, at approximately 3:46 a.m., he was walking a woman home through an alley in the 6200 block of Archer Road in Summit, Illinois. A marked police SUV pulled up from behind them and stopped in the intersection of a cross alley, blocking their way. An officer, who was always the one who arrested him in the past, jumped out and grabbed him. When the officer exited his vehicle, he walked past the woman, who was in front of defendant, and reached towards defendant's hip, where he found a gun. Defendant stated that the officer "put

him against the SUV, called the stop in, took the gun from out of [his] waist and then put handcuffs on [him]." Another squad car came and took defendant away. On redirect, defendant clarified that the officer said nothing to him when he approached defendant and the woman.

¶ 7      Summit police patrol lieutenant John Bragassi testified that he was a 26-year officer with the Summit Police Department. On May 20, 2018, he was on patrol alone near 6143 South Archer Road in Summit, in uniform and in a marked police vehicle. Lieutenant Bragassi stated that he was in an alley near that location, which was located in a business district and had a lot of bars in that area.  He stated that some of the bars closed at 2 a.m., two closed at 4 a.m., and the location was a high crime area, with gang activity and drugs. Lieutenant Bragassi testified that he was driving northbound through the alley when he saw two people staggering approximately a block ahead of him. He continued northbound to see what they were doing.  When he got closer, he saw a woman and defendant, whom he recognized and later identified in court.  Lieutenant Bragassi stated that defendant was carrying a translucent yellow cup with red liquid in it.  He was unable to determine exactly what type of liquid was in the cup, so he pulled alongside defendant and asked him if there was liquor in the cup, and defendant responded "yes." At no time did he activate the overhead lights or sirens. At that point, Lieutenant Bragassi exited his vehicle to issue defendant a citation for having open liquor in the alleyway. As he walked up to defendant, he asked whether defendant had any weapons on him.  Defendant just "stared" at him and did not answer.  Lieutenant Bragassi told defendant that he was going to pat him down for weapons and then reached towards defendant's waistband, at which point defendant swatted his hand away with a cell phone. Lieutenant Bragassi told defendant not to move his hands, and then he patted defendant down. After feeling what he believed to be a handgun, Lieutenant Bragassi lifted defendant's shirt and a

gun was recovered from defendant's waistband. He stated that he could see something on defendant's waistband when defendant hit his hand away. The gun recovered was a .45 caliber Taurus PT 145 with nine live rounds of ammunition. He placed defendant in handcuffs, then asked whether defendant had a firearm owner's identification card (FOID) or a conceal carry license (CCL), to which defendant responded "no." Lieutenant Bragassi stated that he handcuffed defendant because he was alone, was trying to secure the weapon, and was concerned for his safety in the area.[1]

¶ 8    On cross examination, Lieutenant Bragassi testified that he had known defendant for many years, and that the liquid in the cup was tested using a portable breath test (PBT). The liquid tested positive for alcohol but was not sent to the lab.

¶ 9    The trial court denied defendant's motion to suppress, based on its conclusions that the officer could stop, but not search, a person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing or about to commit an offense. The court further found that this was what occurred when the officer pulled up and asked defendant if there was alcohol in the cup. The court stated that if the pat-down had occurred at that time, it would have agreed that there was no probable cause. However, the fact that the officer asked defendant about weapons and defendant did not answer would make a reasonable person concerned that a person may be armed. Additionally, the court noted that defendant hit the officer's hand away when the officer reached out to do the pat-down, which would heighten the officer's suspicions, and thus the pat-down was reasonable because he also

---

[1] The record is unclear whether Lieutenant Bragassi issued defendant a citation for open alcohol at that time.

saw the bulge in the waistband at this time. The trial court concluded that there was no fourth amendment violation and denied the motion to suppress.

¶ 10    Defendant subsequently filed a motion to reconsider the denial of his motion to suppress (the copy of the motion contained in the record does not indicate the date it was filed). In his motion to reconsider, defendant reiterated his arguments made in the initial motion to suppress and supported them with caselaw. A hearing was held on the motion to reconsider on May 3, 2019, at which time there was additional evidence presented that defendant was a known member of the Latin Kings.  The trial court subsequently denied the motion to reconsider.

¶ 11                                2. Trial Proceedings

¶ 12    The matter proceeded to a bench trial on September 3, 2019. Lieutenant Bragassi testified consistent with his testimony at the pretrial hearing on defendant's motion to suppress. Lieutenant Bragassi did not testify that he read defendant his *Miranda* warnings at any time.  Defendant was charged with possession of a gun on a public way and possession of open alcohol in a public place in violation of a local ordinance. Defendant objected to testimony regarding recovery of the gun, renewing his motion to suppress.

¶ 13    The trial court noted that the violation of the local ordinance was not part of its court file and found no conviction for that charge. The trial court did, however, find defendant guilty of aggravated unlawful use of a weapon, noting that the situation took place in a high crime area and the officer was outnumbered.

¶ 14    Defendant's posttrial motion for a not guilty verdict or new trial based on the improper admission of the gun was denied on October 1, 2019. The trial court sentenced defendant to a one-

year term of imprisonment and a one-year term of MSR. Defendant's timely notice of appeal followed.

¶ 15                                              DISCUSSION

¶ 16     On appeal, defendant contends that his motion to suppress should have been granted because: (1) his detention by the officer was an unconstitutional seizure, (2) the officer's pat-down was an unconstitutional search, and (3) the gun should have been suppressed. He requests that this court reverse his conviction, remand the case for a new suppression hearing and a new trial, if necessary. The main issue raised by defendant on this appeal is whether the motion to suppress was properly denied.

¶ 17                                     1.  Standard of Review

¶ 18     A trial court's ruling on a defendant's motion to suppress evidence and quash arrest usually involves questions of both fact and law. *People v. Flunder*, 2019 IL App (1st) 171635, ¶ 20. A trial court's factual findings are given great deference and will not be disturbed on review unless they are against the manifest weight of the evidence. *Id.* at ¶ 21. At a hearing on a motion to suppress evidence and quash arrest, the trial court acts as the factfinder and as such, is responsible for determining the credibility of the witnesses, drawing reasonable inferences from the testimony and other evidence and weighing the evidence presented. *Id.*

¶ 19     The trial court's ruling on the ultimate question of whether the evidence must be suppressed is a question of law that we review *de novo*. *People v. Moss*, 217 Ill. 2d 511, 518 (2005). Additionally, the reviewing court may consider evidence adduced at trial as well as at the suppression hearing. *People v. Smith*, 2015 IL App (1st) 131307, ¶ 20.

¶ 20     The defendant bears the burden of proof on a motion to suppress evidence. *People v. Williams*, 2020 IL App (1st) 172992, ¶ 8. If the defendant makes a *prima facie* showing that the evidence was obtained in an illegal search or seizure, the burden shifts to the State to provide evidence to counter the defendant's *prima facie* case. *Id.* The ultimate burden of proof remains with defendant. *Id.*

¶ 21     Here, defendant made a *prima facie* case that the officer obtained the gun illegally by proving that Lieutenant Bragassi stopped and searched him without a warrant.  See *id.* at ¶ 9; *People v. Cregan*, 2014 IL 113600, ¶ 26. The burden then shifted to the State to present evidence proving the search was valid.

¶ 22                                         2. Fourth Amendment

¶ 23     Both the fourth amendment of the United States Constitution and the Illinois Constitution of 1970 guarantee the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., amend. IV, Ill.Const.1970, art. I, § 6. The essential purpose of the fourth amendment is to impose a standard of reasonableness on the exercise of discretion by police to safeguard the privacy and security of people against arbitrary invasions.  *Smith*, 2015 IL App (1st) 131307, ¶ 21; See also *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979); *People v. Colyar*, 2013 IL 111835, ¶ 31; *People v. McDonald*, 239 Ill. 2d 260, 266 (2010). Reasonableness is measured in objective terms by examining the totality of the circumstances. *Moss*, 217 Ill. 2d at 518 (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

¶ 24     It is well settled that not every encounter between the police and a private citizen results in a seizure. *Smith*, 2015 IL App (1st) 131307, ¶ 22. Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative

detentions, or "*Terry* stops," which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment concerns. *Id.* In *Terry*, the Supreme Court held that an officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere "hunch." *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *People v. Gherna*, 203 Ill. 2d 165, 177 (2003). Additionally, under *Terry*, the reasonableness of police action taken during an investigative detention involves a dual inquiry: (1) whether the officer's action was justified at its inception; and (2) whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry*, 392 U.S. at 21-22; *People v. Baldwin*, 388 Ill. App. 3d 1028, 1031-32 (2009). The *Terry* standard extends to individuals who are walking on public streets. *Terry*, 392 U.S. at 9.

¶ 25                                  3. Unconstitutional Detention

¶ 26    Turning our attention to the case at bar, our review of the State's evidence presented at the suppression hearing yields the conclusion that the encounter between defendant and Lieutenant Bragassi should be examined as a *Terry* stop. As noted above, a *Terry* stop is a brief, investigatory stop that must be supported by a reasonable, articulable suspicion of criminal activity. *Smith*, 2015 IL App (1st) 131307, ¶ 22.

¶ 27    Here, Lieutenant Bragassi testified that he saw two people walking in the alley and they were staggering. He also testified that the area was a business district with some bars located there, at least two of which were open until 4 a.m. We find it to be a reasonable presumption that people who were patrons of those local bars would have consumed alcohol and could be staggering while

walking away from the area. However, staggering while walking down a public way is not, in and of itself, a crime; nor, does it create a reasonable suspicion that a crime had been committed, was about to be committed, or justified further inquiry by police. See, e.g. *People v. Bloxton*, 2020 IL App (1st) 181216, ¶ 21-22.

¶ 28    By his own testimony, both at the suppression hearing and at trial, Lieutenant Bragassi implied that the people were "staggering" as if they had been drinking, perhaps from one of the local bars. He also admitted that he decided to follow the people to "see what they were doing." The act of staggering near a bar would not lead a reasonable person to believe that they were in the act of or about to commit a crime. Thus, the fact that they were staggering, did not justify the officer's decision to follow them in the first place. Presence in a high crime area, by itself, is an insufficient basis for a reasonable suspicion. *People v. Moorman*, 369 Ill. App. 3d 187, 193 (2006). Contrary to the dissent's view, we believe that this type of police activity is precisely the focus of the fourth amendment- the right of people to be free from unreasonable police intrusion as they carry out their daily activities. See *Smith*, 2015 IL App (1st) 131307, ¶ 21.

¶ 29    After deciding to follow the two people for no reason other than that they were staggering while walking down the alley, Lieutenant Bragassi got closer and recognized defendant who was holding a cup of unidentifiable liquid, so he stopped them. To be clear, Lieutenant Bragassi had no reasonable suspicion that any criminal activity was afoot when he first decided to follow them; it was only after deciding to follow them and seeing the cup of liquid that he was able to justify an inquiry into the contents of the cup in defendant's hand. While this would be a justifiable *Terry* stop if this were Lieutenant Bragassi's initial observation when he first saw defendant and the woman walking, we cannot find that to be the case where it appears that he followed defendant

and his companion in the hopes of catching some criminal activity. We note additionally that there was also evidence presented before the trial court that Lieutenant Bragassi and defendant had multiple previous encounters, at least some of which ended in defendant's arrest, which may have influenced the decision to conduct the stop.

¶ 30     At oral argument, the State argued that this was a consensual encounter, supported by the *Mendenhall* factors. We disagree. In *United States v. Mendenhall*, 446 U.S. 544, 553 (1980), the Supreme Court stated that "a person is seized when, by means of physical force or a show of authority, the person's freedom of movement is restrained." The Court went on to state:

> "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554.

Illinois adopted the *Mendenhall* factors. See *People v.* Crosby, 231 Ill. 2d 362, 274 (2008). While the precise examples provided in *Mendenhall* were not present in the case at bar, we agree with the argument made by defendant's appellate counsel at oral argument, namely, that defendant and his companion, who were walking down an alley at 3:45 a.m. being followed by an officer in a marked police car that cut them off, would not feel free to leave, and were in fact seized.

¶ 31     Accordingly, we find that, under the specific circumstances of this case, this was an unconstitutional detention which constituted an unreasonable seizure of defendant's person.

*People v. Creagh*, 214 Ill. App. 3d 744, 747 (1991) (the fourth amendment requires that a seizure be reasonable, and the reasonableness of a seizure depends on a balancing of the public's interest and the individual's right to personal security free from arbitrary interference by police officers).

¶ 32                                    4. Unconstitutional Search

¶ 33    Whether an investigatory stop is valid is a separate question from whether a search for weapons is valid. *People v. Galvin*, 127 Ill. 2d 153, 163 (1989). The fact that an officer has reason to stop a person does not automatically justify the further intrusion of a search for weapons. *Id.* Rather, in order to validly conduct a weapons frisk under *Terry*, the officer must have reason to believe that "the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Terry*, 392 U.S. at 24. The sole justification for this type of search is the protection of the police officer and others in the vicinity, not to gather evidence. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *Galvin*, 127 Ill. 2d at 170. The scope of such search is therefore strictly limited to a search for weapons. *Galvan*, 127 Ill. 2d at 170.

¶ 34    The validity of a frisk conducted during a valid investigatory stop is assessed by an objective standard. *Terry*, 392 U.S. at 21-22. The question is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Terry*, 392 U.S. at 27. The officer conducting the frisk must be able to point to specific, articulable facts which, when taken together with natural inferences, reasonably warrant the intrusion. *Terry*, 392 U.S. at 21. These facts need not meet probable cause standards but must constitute more than a mere hunch. *People v. Flowers*, 179 Ill. 2d 257, 264 (1997).

¶ 35    According to Lieutenant Bragassi's testimony, once he inquired about the contents of the cup and defendant indicated that it was alcohol, he stopped and exited his vehicle to issue defendant a citation for having open alcohol on a public way. Assuming, *arguendo*, that the stop was a valid *Terry* stop from the beginning, the purpose of the investigative stop ended once Lieutenant Bragassi was preparing to issue defendant a citation. *Knowles v. Iowa*, 525 U.S. 113, 118 (1998).  See also *People v. Gherna*, 203 Ill. 2d 165, 183 (2003). However, Lieutenant Bragassi then asked whether defendant had any weapons on him and indicated that he was going to do a pat-down search of defendant. Questioning defendant about the presence of weapons was completely unrelated to the observed violation, which resulted from defendant's admission to possession of open alcohol on a public way and provided the basis for the stop. See *People v. Bunch*, 207 Ill. 2d 7, 17 (2003); *People v. Parra*, 352 Ill. App. 3d 584, 587 (2004).

¶ 36    A valid *Terry* stop can be broadened into an investigatory detention if the officer discovers specific, articulable facts which give rise to a reasonable suspicion that the defendant has committed or is about to commit a crime. *People v. Baldwin*, 386 Ill. App. 3d 1028, 1035 (2009). Here, the reason articulated for justification of the search was the officer's safety and the "area."

¶ 37    A warrantless search is unreasonable unless the officer presents specific, articulable facts which would cause a reasonable person to fear for his safety or the safety of others.  However, the testimony by an officer that he subjectively feared for his safety, standing alone, does not satisfy this requirement.  *Smith*, 2015 IL App (1st) 131307, ¶ 22. Here, Lieutenant Bragassi did not testify that he had any reasonable suspicion that defendant was armed, although he stated that he wanted to do the pat down because of the area they were located in, and he was alone. However, the record reflects that at no point did Lieutenant Bragassi radio for assistance between the time he stopped

defendant and the time of the pat down. Additionally, it should be noted that at no time did Lieutenant Bragassi question the woman or attempt to search her. Moreover, there was no evidence that defendant attempted to avoid Lieutenant Bragassi when he drove up alongside him. To the contrary, defendant was cooperative and responded truthfully that there was alcohol in the cup. Simply put, there was no evidence presented to support any suggestion that Lieutenant Bragassi was either in danger or believed himself to be in danger when he searched defendant. See *People v. Surles*, 2011 IL App (1st) 1000068, ¶ 35 (a police officer may perform a protective pat-down search where, after making a lawful stop, the officer has a reasonable articulable suspicion that he or another is in danger of attack because the defendant is armed and dangerous). Further, there was no testimony that Lieutenant Bragassi believed that defendant had committed any crime beyond possession of open alcohol on a public way. Defendant's mere presence in a high-crime area, alone, does not rise to the level of reasonable suspicion. *Surles*, 2011 IL App (1st) 1000068, ¶ 35.

¶ 38    In *Knowles*, the Supreme Court found that the threat to officer safety from issuing a traffic citation was a good deal less than in the case of a custodial arrest, and further that the need to discover and preserve evidence does not exist in a traffic stop, for once the defendant was stopped for speeding and issued a citation, all evidence necessary to prosecute that offense had been obtained. *Knowles*, 525 U.S. at 118.

¶ 39    The same conclusion is warranted here where there was no articulable threat to Lieutenant Bragassi's safety nor does the record demonstrate that a need existed to preserve additional evidence for defendant's possession of alcohol on a public way. As such, we conclude that the search was unconstitutional and that the product of the search, i.e., the gun, should have been

suppressed as "fruit of the poisonous tree." *Bloxton*, 2020 IL App (1st) 181216, ¶ 28 (citing *People v. Aguilar*, 2013 IL 112116, ¶ 33). Under that doctrine, the fourth amendment violation search is deemed the poisonous tree and any evidence obtained by exploiting that violation is considered its fruit and is thereby subject to suppression. *Bloxton*, 2020 IL App (1st) 181216, ¶ 29.

¶ 40 We also reject the argument that the search was warranted once the bulge in defendant's waistband was discovered; the presence of a bulge in a defendant's clothing standing alone is insufficient to warrant a search. *Surles*, 2011 IL App (1st) 1000068, ¶ 40. Similarly, the warrantless search and recovery of the gun cannot be justified by defendant's failure to have a FOID card or CCL. While Lieutenant Bragassi later learned that defendant did not have a FOID card or CCL, that was not information known to him when he first observed defendant with the gun and was gleaned only after he had already handcuffed defendant. Lieutenant Bragassi did not testify to any articulable fact that gave rise to suspicion that defendant was committing or had committed a gun-related crime. See *People v. Horton,* 2019 IL App (1st) 142019-B, ¶ 61. Additionally, it bears mentioning that solely possessing a gun no longer automatically amounts to criminal conduct. See A*guilar*, 2013 IL 112116, ¶ 20; *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40.

¶ 41 We conclude that the gun was recovered after an unlawful warrantless search of defendant, and conclude, based on the facts presented in this case, that the trial court's decision to deny defendant's motion to suppress was against the manifest weight of the evidence. We find that the motion to suppress should have been granted. Further, without the seized evidence, the court had no basis for finding defendant guilty of aggravated unlawful use of a weapon. Accordingly, we reverse defendant's conviction without remand. *Williams*, 2020 IL App (1st) 172992, ¶ 12.

¶ 42 CONCLUSION

¶ 43    We reverse the denial of defendant's motion to suppress the evidence recovered from the unconstitutional search of defendant. Without the suppressed evidence, the State cannot prove defendant guilty of aggravated unlawful use of a weapon.  Accordingly, we reverse defendant's conviction and vacate his sentence.

¶ 44    Reversed and sentence vacated.

¶ 45    JUSTICE HARRIS, dissenting:

¶ 46    I respectfully disagree with my colleagues that the trial court's decision to deny defendant's motion to suppress was against the manifest weight of the evidence or otherwise erroneous. I therefore would affirm defendant's conviction.

¶ 47    According to Lieutenant Bragassi's hearing testimony, he was in an alley in a high-crime area with gang and drug activity, in a business district with many bars, at about 3:45 a.m. when some bars in that area had already closed and others were going to close at 4 a.m. He followed two people he saw staggering down the alley, one being defendant. The majority states that "the fact that they were staggering, did not justify the officer's decision to follow them in the first place." *Supra* ¶ 28. However, I am unaware of any case law holding that following someone along a public way is either a search or seizure constitutionally, as it is neither logically. While reasonable articulable suspicion is required for a *Terry* stop, following someone is clearly *not* stopping them.

¶ 48    When Bragassi got closer to the two staggering people, he saw that one of them was defendant, who was carrying a translucent yellow cup with red liquid in it. While Bragassi admitted to not knowing what liquid was in the cup, a reasonable person could suspect under the circumstances – a staggering person holding an open cup of liquid in an area with many bars, in the early-morning hours when some bars had closed, and others were still open – that the ordinance

against open containers of alcohol was being violated. I would find that Bragassi had reasonable suspicion and could conduct a *Terry* stop to either confirm or refute that suspicion.

¶ 49 The majority is arguably correct that "Bragassi had no reasonable suspicion that any criminal activity was afoot when he first decided to follow them; it was only after deciding to follow them and seeing the cup of liquid that he was able to justify an inquiry into the contents of the cup in defendant's hand." *Supra* ¶ 29. However, what the majority says next does not follow from that: "While this would be a justifiable *Terry* stop if this were Lieutenant Bragassi's initial observation when he first saw defendant and the woman walking, we cannot find that to be the case where it appears that he followed defendant and his companion in the hopes of catching some criminal activity." *Id.* Instead, I would state that Bragassi suspected something untoward but did not exercise his police powers by stopping defendant until the final factor of the open cup of liquid was added to the aforesaid circumstances and a vague or inchoate suspicion ripened into a reasonable and articulable suspicion. As I stated above, following someone is not a stop or seizure. The majority seems to require that reasonable suspicion must spring immediately into existence and to hold that a *Terry* stop is improper if an officer went through a stage of inarticulable suspicion even if he or she did not perform a stop until he or she had a reasonable and articulable suspicion.

¶ 50 When Bragassi stopped next to defendant and asked him if there was liquor in the cup, he replied affirmatively and Bragassi exited his vehicle to issue defendant a citation for having open liquor. The majority states that "[a]ssuming, *arguendo*, that the stop was a valid *Terry* stop from the beginning, the purpose of the investigative stop ended once Lieutenant Bragassi was preparing to issue defendant a citation." *Supra* ¶ 35. The *Terry* stop was indeed over, because reasonable suspicion had ripened with defendant's reply into probable cause for an ordinance violation.

However, the majority cites a case (*Gherna*, 203 Ill. 2d at 183) where the reasonable suspicion underlying the *Terry* stop had been dispelled, the stop should have ended at that point, and further investigation or detention was unduly prolonging the stop. In stark contrast to *Gherna*, it was quite proper that the stop of defendant had not ended with his answer because Bragassi was about to write him a citation for an admitted ordinance violation.

¶ 51    Bragassi testified that as he walked up to defendant, he asked whether defendant had any weapons on him. When defendant stared at him and did not answer, Bragassi resolved to frisk him. The majority states that Bragassi "asked whether defendant had any weapons on him and indicated that he was going to do a pat-down search of defendant" (*supra* ¶ 35) but this conflates two distinct events. I would find that Bragassi had articulable facts that would cause a reasonable person under the circumstances to fear for his safety when he asked defendant if he was armed: he was alone in a dark alley in a high-crime area, where bars were going to close soon and disgorge their late-night drinkers, with two staggering people including a person carrying an open alcoholic drink who was about to be ticketed for an ordinance violation. Bragassi decided to address his concerns in a relatively inobtrusive manner by asking defendant if he was armed, but defendant did not allay or dispel those concerns when he stared at Bragassi and did not reply either that he had or did not have a weapon. I would conclude that Bragassi had reasonable suspicion to support a frisk or pat down of defendant when he stated that he would frisk him and reached to do so. Defendant merely added to the existing grounds for a frisk when he swatted Bragassi's hand away before Bragassi finally frisked him and found the gun.

¶ 52    Lastly, once Bragassi found the gun, he handcuffed defendant, asked him if he had a FOID card or CCL, and he replied that he did not. The majority states correctly that "[w]hile Lieutenant

Bragassi later learned that defendant did not have a FOID card or CCL, that was not information known to him when he first observed defendant with the gun and was gleaned only after he had already handcuffed defendant." *Supra* ¶ 40. However, again the majority's next remark does not follow from that fact: "Bragassi did not testify to any articulable fact that gave rise to suspicion that defendant was committing or had committed a gun-related crime." *Id.* Police are not required to eliminate all legal explanations for possessing a firearm before conducting a *Terry* investigation into a possible weapons offense, and handcuffing does not necessarily render a *Terry* stop an arrest. *People v. Colyar*, 2013 IL 111835, ¶ 46; *People v. Hood*, 2019 IL App (1st) 162194, ¶ 71. In sum, I conclude that Bragassi in finding a firearm had reasonable suspicion to support his *Terry* investigation into whether defendant was committing a weapons offense, and defendant confirmed Bragassi's suspicion by answering that he had no FOID card or CCL.

¶ 53    I find no error in the court's denial of defendant's motion to suppress. I would therefore affirm defendant's conviction.