2024 IL App (1st) 221594-U

No. 1-22-1594

Second Division
June 28, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
|  | ) | |
| Plaintiff-Appellee, | ) | |
|  | ) | No. 14-CR-1656 |
| v. | ) | |
|  | ) | |
| DANIEL MARTINEZ, | ) | Honorable |
|  | ) | Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Peggy Chiampas, |
|  | ) | Judges, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court erred in denying defendant-appellant's motion to suppress evidence where the doctrine of hot pursuit could not justify law enforcement's pursuit and warrantless arrest.

¶ 2    In December 2013, defendant-appellant, Daniel Martinez, was arrested in Chicago, Illinois, after Chicago Police officers initially observed him holding a Corona beer bottle on the sidewalk outside of his residence, which is a jailable misdemeanor offense in Chicago. After following him

onto the property, officers discovered that he was carrying a firearm, and later determined that he was 21 years old and did not have a valid Firearm Owner's Identification (FOID) Card pursuant to the Firearm Owners Identification Card Act (430 ILCS 65/1) (West 2012)). Defendant was subsequently charged by information with four counts of a Class 4 felony, unlawful firearm possession under Illinois' aggravated unlawful use of a weapon (AUUW) statute pursuant to the Code of Criminal Procedure of 1963, 720 ILCS 5/24-1.6 (West 2012). Following the denial of his motion to quash and suppress evidence, defendant proceeded to a bench trial in April 2017 and was found guilty of two counts of aggravated unlawful use of a weapon, which were merged by the trial court. Defendant subsequently filed a posttrial motion, arguing that the court erred in denying his motion to suppress, and that he had not been proven by reasonable doubt at trial and was entitled to a new trial.

¶ 3    Due to other pending separate charges against him, defendant's posttrial motion and sentencing hearing did not occur until April 2019, almost two years after his trial. Ultimately, defendant was sentenced to two years in the Illinois Department of Corrections, and credited one year for time already served, with an additional year of mandatory supervised release. Defendant's appeal to this court was dismissed as premature, where the record did not show that the trial court had ruled on his timely posttrial motion.[1] On remand, a new trial judge denied that motion.

¶ 4    Defendant now brings this second appeal, arguing that: (1) his warrantless arrest at his home lacked sufficient probable cause; and (2) even assuming his arrest was lawful, Illinois' prohibitions on handgun possession by those under the age of 21 pursuant to the AUUW statute and the FOID statute are unconstitutional pursuant to the recently issued United States Supreme

---

[1]See *People v. Martinez*, No. 1-19-1083 (unpublished order pursuant to Illinois Supreme Court Rule 23).

Court case of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). For the reasons that follow, we reverse defendant's conviction.

¶ 5                                    I. BACKGROUND

¶ 6     On December 20, 2013, defendant was arrested by four plain-clothed police officers at his home at 1832 West 22nd Place in Chicago, Illinois, after officers, travelling in an unmarked police vehicle, observed him with an open Corona bottle on a public sidewalk. After officers announced their office, defendant retreated behind the gated fence separating his residence from the sidewalk. Officers entered the property by opening the gate and following him up the front steps. Upon a search of his person, a handgun was recovered from his jacket pocket.

¶ 7     On January 21, 2014, defendant was charged with four counts of unlawful possession of a firearm. Count I alleged that defendant had possessed a firearm at his home without a valid FOID card (720 ILCS 5/24-1.6(a)(1), (3)(C) (West 2012)). Count II alleged that he had possessed a firearm under the age of 21 years old (720 ILCS 5/24-1.6(a)(1), (3)(I) (West 2012)). Counts III and IV mirrored counts I and II, with the additional caveat that defendant's firearm possession had also occurred on public land (720 ILCS 5/24-1.6(a)(2), (3)(C), 24-1.6(a)(2), (3)(I) (West 2012)). The State dismissed counts III and IV by *nolle prosequi* and proceeded to trial on counts I and II.

¶ 8     Prior to trial, defendant filed a motion to quash and suppress any physical evidence or statements obtained after his arrest. Therein, defendant argued that his arrest was made without a valid search or arrest warrant, and that his arrest was unjustified under either a probable cause or

reasonable suspicion standard. We recite the relevant testimony adduced from both the suppression hearing and at trial below.[2]

¶ 9                              A. Suppression Hearing

¶ 10                              1. Kendall Hanen

¶ 11    On direct examination by defense counsel, Hanen testified that she was the defendant's ex-girlfriend and that the couple had broken up about two years prior. She was currently twenty years old and lived in Lombard, Illinois. Hanen was a student at Chamberlain College of Nursing, and also worked at Lexington Healthcare as a "PCT." On the day of defendant's arrest, Hanen and defendant had still been in a relationship and she had observed his encounter with police. Hanen was shown a photograph of defendant's home, located at 1832 West 22nd Place, and confirmed it as an accurate depiction of his home during daytime hours.

¶ 12    On December 20, 2013, at or around 11:45 p.m., Hanen and defendant had been outside the home with Elicio Solano[3] and Marco. Hanen did not know Marco's last name. Hanen initially testified that all four had been sitting on the stairs of the front porch, but later testified that Marco had been sitting a "stair above" them while Solano stood outside the gate surrounding the property. Solano had arrived at the home about 30 minutes prior to the arrest, and Hanen did not recall if he had been drinking alcohol. Hanen denied that either Solano or defendant had been holding any items in their hands, and further denied that defendant had any visible "bulges," "protrusions," or a gun sticking out of his waistband. However, he had been wearing a large winter jacket.

_____

[2]Defendant's suppression hearing, trial, and sentencing was presided over by the Honorable Maura Slattery Boyle. Upon remand, his posttrial motions were heard and ruled upon by the Honorable Peggy Chiampas.

[3]Solano's first and last name is spelled differently throughout the report of proceedings. He was also referred to as a co-defendant by the parties in the report of proceedings, but we have no documentary confirmation of this.

¶ 13    Hanen testified that an unmarked police car drove in front of the house, and that four officers "immediately" exited the vehicle. She described the officers as wearing jeans, black shirts, and vests. She was unsure of what kind of car they were driving, but knew it was a smaller sedan. The four officers ran towards the gate, and Solano walked inside the property and attempted to lock the gate. One officer ran towards the gate, put his hand inside of it, and opened it. The officers then ran towards or up the stairs where the others were still seated. Initially, the officers did not say much to Hanen, but "grabbed" the other three. Hanen further testified that one officer immediately ran toward defendant and grabbed him from his position on the stairs, and then brought him outside the gate to the sidewalk. Once the officer searched defendant, he found a gun and recovered it from defendant's pocket. Hanen stood up and moved towards the front door, and an officer subsequently told her to "get out of the way" and then grabbed her.

¶ 14    On cross-examination by the State, Hanen testified as follows. She and defendant had dated for about nine months. Hanen denied having any knowledge that defendant had a gun in his pocket. When asked if any of the four had beers with them that night, she responded, "not that I remember, no." When asked if she had any difficulty recalling the events of that night, she responded, "no, I wouldn't say that," and said she could remember "everything in detail."

¶ 15    Hanen testified that, at the time of the arrest, it was about midnight and was cold outside. The streets were lit and defendant's home also had lights on in front of the property, so "everyone could see each other." Hanen reiterated that the four had been hanging out and talking amongst themselves on the steps for about 30 minutes. However, she also testified that Solano had been standing out in front of the property that night. Because the street had been well lit, Hanen had also been able to see the police when they exited their vehicle, but did not recognize them as police until they were in front of the home. She denied that the vehicle had been an unmarked Ford

Explorer. When asked if she was "positive" that it had been a sedan, she responded, "I can't think of the exact name of the car, but I believe[d] it to be a Grand Victorian or something like that."

¶ 16    Hanen denied that everyone had attempted to go inside the house once the police left their vehicle, but then stated that Marco had attempted to go inside while defendant remained sitting. Solano went inside the gate but did not go inside the property and tried to shut the gate door. Hanen denied that defendant ever tried to move away or get up from his position on the stairs. She only rose from her own position to remove herself from harm once officers began running up the stairs. She had been able to observe the officer's search of defendant, which included a search of defendant's right front jacket pocket, from which he recovered a handgun. She further testified that, prior to the officer touching any part of defendant's jacket from the outside, the officer "immediately" opened the jacket to search inside the coat.

¶ 17    On redirect examination, Hanen reiterated that defendant had not left the property while they had been together, and only did so when the police removed him from his position.

¶ 18    At the close of Hanen's testimony, defendant motioned for a directed finding. The motion was denied.

¶ 19                                    2. Officer Ricardo Gonzalez

¶ 20    Gonzalez testified on direct examination for the State. He had been an officer with the Chicago Police Department (CPD) for 18 years. On the night of defendant's arrest, he had been assigned to the gang enforcement unit. Part of his assignment was to patrol the area around 1832 West 22nd Place. He and three other officers were patrolling the area in an unmarked Ford Explorer, which was "police equipped" with lights and sirens. The car was not equipped with any cameras or similar systems. Gonzalez sat in the front passenger seat and was not wearing a body

camera. The car had been travelling westbound on 22nd Place off Wood Street at about 20 miles per hour.

¶ 21    As they drove, an "individual" caught his eye, who Gonzalez identified in court as the defendant. Defendant stood on the north side of the street, which would have been to the right of Gonzalez's view. The car had been about "two to three car lengths" away from defendant when Gonzalez first viewed him. The car's headlights were on, and the street was "artificially lit." There had also been cars parked on the north side of the street, but when asked if those vehicles had potentially obstructed his view, Gonzalez responded that the "Ford Explorer s[at] up a little bit higher than a regular squad car[,]" which allowed him to see through the gaps of the cars.

¶ 22    When asked what about defendant caught his eye, Gonzalez testified that defendant had been out on the sidewalk "holding a Corona bottle in his right hand" and thus Gonzalez believed that defendant had been committing the crime of drinking on the public way. Solano also caught his eye. Gonzalez recognized Solano because he had an outstanding warrant for aggravated unlawful possession of a weapon. Gonzalez testified that, prior to his shift that night, and as he did on a daily basis, he had reviewed the outstanding warrant list at the police station,

¶ 23    Based on these observations, the car stopped and parked directly in front of a house at 1832 West 22d Place. Defendant stood about "one address over" in the westward direction from where the car was parked. Gonzalez "jumped" out of the vehicle, announced his office, and told defendant to "stop." As Gonzalez exited the vehicle, defendant failed to adhere to Gonzalez's demand and began to walk behind the gate of the property. Solano also walked behind the gate, which bordered the public sidewalk. Both Solano and defendant began to walk up the staircase on the property. Gonzalez walked to the closed but unlocked gate, opened it, went inside the property, and grabbed defendant by his right hand about three or four stairs up the front porch. Defendant was no longer

holding the beer bottle, which Gonzalez believed he had either put down or "do[ne] something with it," as he had last seen defendant with the bottle when he walked behind the gate.

¶ 24 Once Gonzalez stopped defendant, he observed that defendant's right arm was completely covered inside of his left jacket pocket. After grabbing defendant's right hand and wrist, Gonzalez told him to bring his hand out slowly. Defendant initially did not comply and Gonzalez repeated this command "more than once." Eventually defendant complied after Gonzalez "forcefully" grabbed defendant's hand to remove it from the pocket. Gonzalez then used his own right hand to recover a gun from the jacket pocket.

¶ 25 When asked why he had first searched defendant's jacket pocket, Gonzalez responded that it had been a "custodial search" and that there had been a reason as to why defendant had not removed his hand from the pocket. When asked if Gonzalez had placed defendant under arrest at that time, he responded "yes, for drinking on a public way," which was a "citable offense" in Chicago. When asked if defendant had received a citation or was arrested for that particular offense, Gonzalez responded, "It's an arrestable offense so we made an arrest." Gonzalez did not personally detain Solano. He further recalled that there had also been a "young lady" and another "young gentleman" at the scene.

¶ 26 Upon cross-examination by defense counsel, Gonzalez testified as follows. On the night of the arrest, he had been stationed in that area for about 10 years, which was known for "high gang activity." Gonzalez's duties within the gang enforcement unit included searching for guns and other criminal activity. When asked if he had been specifically looking for guns that night, Gonzalez responded that, while on patrol, "usually we go where the gangs are." On the night of the arrest, he did not have any information regarding defendant or whether he possibly possessed

a gun. However, he had been looking for someone that he knew had an active warrant that "frequented the area."

¶ 27 During his time in the unit, Gonzalez had used different police vehicles while on patrol. Gonzalez admitted that his written police report did not indicate what vehicle the officers had driven that night, but stated they had been assigned a Ford Explorer "for the whole time [he] was there."[4] However, he denied "always" using a Ford Explorer during that ten-year period because the gang unit "moved around," which was a "complicated scenario."

¶ 28 On the night of the arrest, Gonzalez and his partners were in plain clothes. When the vehicle stopped, it did so next to a parked car. When Gonzalez left the vehicle, Solano had been outside the gate but had not been drinking. Gonzalez admitted that defendant did not run once Gonzalez began approaching him. He further admitted that defendant had not been holding his waistband, his pocket, or his side. Gonzalez also did not notice any bulges or protrusions from either defendant's waistband or his pockets.

¶ 29 Gonzalez testified that when he reached defendant, the two were standing directly in front of each other on the porch, either on the third or fourth step. Gonzalez estimated that he asked defendant three or four times to remove his hand. Gonzalez then placed him into custody, took him off the property, and recovered the gun, which appeared to be in contradiction to his testimony on direct examination that the gun had been recovered while on the porch. Gonzalez admitted that he never recovered the Corona bottle following the arrest, nor was one ever collected for inventory. When asked if he had seen what the contents of the bottle were, Gonzalez responded, "[a] Corona

---

[4]Gonzalez's arrest report was not introduced into evidence. However, it was included in part of the impounded record on appeal and was referenced by the trial court judge in its ruling on the motion to suppress.

bottle usually has beer in it." When asked if the bottle had been full or empty, he answered "it still had some fluid in there."

¶ 30    Following closing argument, the trial court denied defendant's motion.

¶ 31                                B. Bench Trial

¶ 32    On April 4, 2017, the case proceeded to a bench trial, where Officer Gonzalez was the sole witness. We recite Gonzalez's trial testimony to the extent that it varies or further elaborates on testimony elicited during the suppression hearing.

¶ 33    On direct examination by the State, Gonzalez testified that on December 20, 2013, at 11:45 p.m., while on patrol, he noticed defendant holding a Corona bottle on a public sidewalk from about two to three car lengths away. Gonzalez again identified defendant in court as the individual holding the bottle.

¶ 34    After Gonzalez observed defendant, he exited the vehicle and kept his eyes on defendant "the whole time." Gonzalez announced his office and told defendant to stop. Defendant began to walk from the public sidewalk to behind the gate into his residence. The gated fence "came right up" to the public sidewalk. Gonzalez proceeded to "unlock[]" the gate and went through. Gonzalez followed defendant as he began to climb the exterior stairs of the property leading to the second floor. He estimated that the staircase had about 12 to 15 stairs, but he never lost sight of defendant as he was about 10 feet behind him.

¶ 35    At some point, when defendant was about four to five steps up the stairs, Gonzalez observed defendant put his right hand in his right outer coat pocket. Gonzalez ordered defendant to remove his hand from his pocket because it was a "custodial search" and he was going to place defendant in custody for drinking on a public way. Defendant initially refused to comply. Gonzalez gave defendant a second verbal command, and then placed his left hand on defendant's right wrist.

After two or three commands, defendant complied and Gonzalez removed defendant's hand from his pocket. Gonzalez then reached into the pocket and recovered a .45-millimeter semi-automatic handgun, which was fully loaded with live ammunition. Gonzalez estimated that about eight to ten seconds elapsed from the time he saw defendant with a Corona bottle to when he recovered the handgun.

¶ 36    Upon cross-examination, Gonzalez testified as follows. He had also observed Solano outside of 1832 West 22nd Place and knew that he was "wanted." He did not have any information regarding the defendant and did not know that 1832 West 22nd Place was defendant's home. A woman had also been outside the residence that night. Gonzalez did not remember if a third male had been present.

¶ 37    When asked if he was "out there looking for people drinking beer on the sidewalk," he responded, "we were out there looking for criminal activity." When asked if he was looking for guns, he responded, "we were out there looking for criminal activity, and if it happens to be, it is what it is whatever criminal activity is out there." Recovery of guns would be an "important mission" for the unit, but he made "multiple arrests" that did not always involve guns. The area in which the arrest occurred was a "high crime, high gang activity area," and the unit was out looking for "potential gang activity." However, he did not observe Solano or defendant "do anything that exhibited gang activity." He denied seeing defendant place anything in his pockets when he initially spotted defendant "drinking" from a Corona bottle on a public way.

¶ 38    When asked if Solano closed the gate to the property when he first approached, Gonzalez clarified that it had been defendant who had done so. The gate had been shut but not locked. Gonzalez described the property as a two-flat and not a single-family home. He clarified that the yard was "not so much a yard" but rather a "regular city lot," with the exterior stairs "go[ing] right

up to the edge of the sidewalk." The stairs also led to defendant's residence on the second level. Defendant had not run up the stairs, and Gonzalez encountered him on the third step with Solano at the top of the landing. When Gonzalez reached defendant, both were located on the same set of stairs and looking right at each other. After he instructed defendant to remove his hands from his pocket and defendant did not comply, Gonzalez grabbed defendant's wrist and "assisted him" in removing his hand. Gonzalez then recovered the handgun with his right hand and placed him into custody. Defendant did not make any statements or admissions about the gun.

¶ 39 Following the conclusion of Gonzalez's testimony, the parties stipulated that defendant had never been issued and did not have a valid FOID card at the time of his arrest. Defendant subsequently moved for a directed finding, which the trial court denied. Following closing argument, the trial court found defendant guilty on both counts.

¶ 40 E. Posttrial Proceedings

¶ 41 Defendant timely filed a posttrial motion in which he sought to have the court enter a finding of not guilty, or, alternatively, a new trial. No ruling was made by the trial court on this motion at the time. Defendant was ultimately sentenced to two years in the Illinois Department of Corrections with one year of mandatory supervised release.[5] Defendant's motion for reconsideration on his sentence was further denied.

¶ 42 G. First appeal (Case No. 1-19-1083)

¶ 43 Defendant filed a notice of appeal on April 29, 2019. On September 21, 2021, we issued an unpublished order pursuant to Illinois Supreme Court Rule 23 (eff. April 1, 2018). Therein, we dismissed defendant's appeal as premature pursuant to Supreme Court Rule 606(b) (eff. March 1,

---

[5]The record reflects that defendant has completed his sentence and is no longer in IDOC custody.

2021). Specifically, we determined that the record on appeal did not demonstrate that the trial court had ruled on defendant's timely posttrial motion for a new trial.

¶ 44                                    H. Remand

¶ 45     On remand, defendant's posttrial motion was heard by a different judge. First, the court addressed defendant's motion to reconsider the denial of the motion to suppress, which it denied. The court indicated that it had reviewed the suppression hearing transcript, which included Gonzalez's testimony and the court's previous findings. The court stated that it "concur[red] in the previous court's decision, which was based on "the officers' testimony that the officers acted reasonably during the course of the investigation" and that the record showed "reasonable suspicion that rose to probable cause." The court specifically noted that "defendant had failed to comply with the officer's request and that his hand was in his pocket and that numerous requests to remove that were not followed by the defendant."

¶ 46     Next, the court denied the entirety of any outstanding issues in the posttrial motion and indicated that the "previous order" of April 4, 2019 was "to stand." Following the court's ruling, defendant filed a timely second appeal.

¶ 47                                    II. ANALYSIS

¶ 48                                A. Standard of Review

¶ 49     On a motion to quash and suppress evidence, the defendant bears the burden of proof. *People v. Cregan*, 2014 IL 113600, ¶ 23. If the defendant makes a *prima facie* showing that the evidence was obtained in an illegal search or seizure, the burden then shifts to the State to provide evidence to rebut that presumption of illegality. *Id.* However, the ultimate burden of proof lies with the defendant. *Id.*

¶ 50    When assessing the trial court's ruling on a motion to suppress, our review is two-fold, beginning with our adoption and deference to the trial court's factual findings unless they are against the manifest weight of the evidence. *People v. Lozano*, 2023 IL 128609, ¶ 29. In a suppression hearing and at a bench trial, it is well-established that it is the role of the trial judge to determine the credibility of the witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. *People v. Richardson*, 234 Ill. 2d 233, 251-52 (2009). However, we also review *de novo* the legal question of whether suppression is warranted. *Id.* Accordingly, we review the totality of the circumstances and the facts adduced at both the suppression hearing and at trial. *Id.* at 251. Because our review of the legal question is *de novo*, we may affirm on any basis found in the record. *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 25. Additionally, "a reviewing court may undertake its own assessment of the facts as they relate to the issues and may draw its own conclusions when deciding what relief should be granted." *People v. McCavitt*, 2021 IL 125550, ¶ 53.

¶ 51                                B. Arguments

¶ 52    The parties do not dispute that law enforcement did not have a warrant for defendant's arrest. Here, the parties disagree as to whether: (1) law enforcement had probable cause to arrest where the officer did not see defendant "actually drinking on a public way" as prohibited by Chicago's ordinance; and (2) whether the "hot pursuit" doctrine justifies police intrusion into the home or its curtilage to execute a warrantless arrest for a non-violent misdemeanor, such as drinking on a public way. As the arguments implicate fourth amendment principles, we begin our analysis there.

¶ 53                            C. Fourth Amendment

¶ 54    The fourth amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; see also *Elkins v. United States*, 364 U.S. 206, 213 (1960) (application of the fourth amendment to state officials through the fourteenth amendment); (U.S. Const., amend. XIV). Article I, section 6 of the Illinois Constitution provides the same. Ill. Const. 1970, art. I, § 6; *Lozano*, 2023 IL 128609, ¶ 30; see also *People v. Lindsey*, 2020 IL 124289, ¶ 15 ("This court has long held that the search and seizure clause of our state constitution stands in 'limited lockstep' with its federal counterpart.")  The  amendment protects people, not places, and the extent of that protection depends on where the people are. *Lindsey*, 2020 IL 124289, ¶ 16.  The "essential purpose" of the fourth amendment is to impose a standard of reasonableness on law enforcement "to safeguard the privacy and security of people against arbitrary invasions." *People v. Smith,* 2015 IL App (1st) 131307, ¶ 21 (quoting *People v. McDonough*, 239 Ill. 2d 260, 266 (2010)). Thus, the "central requirement of [any] fourth amendment analysis is reasonableness." *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 27.

1. The Warrant Requirement, Probable Cause, and Exceptions

¶ 56    Defendant first contends that there was no probable cause to arrest him because the officer did not observe him actually drinking on the public way, as required by Chicago's ordinance. He maintains that the ordinance does not proscribe "mere possession of an open bottle of alcohol." Defendant points out that Officer Gonzalez did not testify that he saw defendant drink from the bottle; instead, he only described seeing him holding an open bottle of alcohol that was still partially full. In support of this contention, defendant points to a separate subsection of the ordinance prohibiting open possession of alcohol on the public way while in a motor vehicle. Additionally, defendant continues, Gonzalez also never testified that he observed defendant

slurring his words, that he smelled of beer, or appeared otherwise intoxicated, citing *People v. Gaytan*, 2021 IL App (1st) 192228-U. Finally, defendant concludes, in conjunction with Hanen's testimony that he had not been drinking, no beer bottle was ever recovered from the scene.

¶ 57    The State responds that there was sufficient probable cause based on the totality of the circumstances. The State asserts that Gonzalez did not need to actually observe defendant drinking from a beer bottle because, given the facts known to the officers at the time, it was reasonable to infer that he was violating the ordinance, which the trial court found to be credible over that of his ex-girlfriend's testimony. We agree with the State.

¶ 58    We first turn to the ordinance. In reviewing the provision, we ascertain and give effect to the intent of the legislature, which is most reliably shown through the plain and ordinary meaning of the statutory language. *People v. Whitehead*, 2013 IL 128051, ¶ 18; see also *Scott v. City of Chicago*, 2015 IL App (1st) 140570, ¶ 11 (applying same principles to municipal ordinances). Further, we strictly construe criminal or penal statutes in favor of the accused, but also assume that the legislature does not intend to produce absurd or unjust results. *Whitehead*, 2013 IL 128051, ¶ 18. In addition to considering the legislature's chosen language, we also take into account "the reason for the law, the evil to be remedied, and the purpose to be obtained thereby." *Id.*

¶ 59    Section 8-4-030(a)(1) of the municipal code (Chicago Municipal Code § 8-4-030(a)(1) (amended at Chi. City Clerk J. Proc. 52958 (May 8, 2013)) is a Class A misdemeanor offense which prohibits drinking alcohol in public ways. Specifically, section 8-4-030(a)(1) prohibits "any person to drink any alcoholic liquor as defined by law on any public way or in or about any motor vehicle upon a public way in the city" with certain exceptions. *Id.* Violation of this ordinance is generally assessed through a fine ranging between $100 and $500, or a period of imprisonment of a period of six months, or both. Chicago Municipal Code § 8-4-030(a)(3) (amended at Chi. City

Clerk J. Proc. 52958 (May 8, 2013)). In contrast, section 8-4-30(a)(2) makes it unlawful for any person to "transport, carry, possess or have any alcoholic liquor in or upon or about any motor vehicle upon any public way in the city except: (1) in the original package and with the seal unbroken, or (2) in a package properly sealed, bagged, and receipted pursuant to section 6-33 of the Liquor Control Act of 1934[.]" Chicago Municipal Code § 8-4-30(a)(2) (amended at Chi. City Clerk J. Proc. 52958 (May 8, 2013)).

¶ 60    We understand defendant's argument on this point to mean that, because the statute by which he was charged does not proscribe mere possession of alcohol, there was no probable cause to support an arrest for drinking on the public way, given that he was only observed to be in possession of a beer bottle. In contrasting that provision with the one prohibiting alcohol in a motor vehicle, defendant argues that the City Council clearly knows how to prohibit mere possession of an open alcohol bottle, but chose not to for possession merely on a sidewalk. This distinction, defendant offers, is based on long-standing practices of prohibiting open alcohol containers due to the "special dangers posed by intoxicated drivers," whereas the same dangers do not exist simply for standing on a public sidewalk. Therefore, defendant reasons, if someone is to be held liable for violating the ordinance while standing on the sidewalk, that person must be shown to be actually drinking.

¶ 61    We find defendant's argument to be wholly without merit. The two separate provisions seek to address two separate evils, one being drunk driving, and the other, disorderly conduct. Notably, defendant offers absolutely no authority on which to base his argument, but taken to its logical conclusion, defendant's argument would mean that, unless an offender is actually caught with a receptable of alcohol placed on his or her mouth, and we further suppose, in the process of

swallowing, no violation of the ordinance has occurred. We do not believe that the City Council intended such absurdity.

¶ 62    Even so, defendant nevertheless argues that "it is wholly legal under Chicago's alcohol ordinance to step onto the sidewalk holding a partly empty beer bottle, for example, to dispose of a bottle in the garbage, to carry the bottle to finish it at a neighbor's home, or just to stretch one's leges after sitting on the stoop talking with friends." That might be the case. However, that was not the evidence presented at the suppression hearing, the burden of which rested with defendant. Gonzalez's testimony at the suppression hearing was that he had spotted defendant holding a Corona bottle on a public sidewalk from a distance of two to three car lengths away, and further identified defendant in court as that individual. However, at trial, although he also said that he only observed him holding the bottle, he later responded that he *did* see defendant drinking from it, a contradiction unexplored by defense counsel during questioning. Regardless of this inconsistency, it is reasonable to assume that even a layperson could conclude that someone holding a half-empty bottle of alcohol had likely been drinking it at some point, especially given the time in which these events occurred, at midnight.

¶ 63    That said, we next consider whether there was probable cause to support defendant's warrantless arrest for drinking on the public way. "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that an arrestee has committed a crime." *People v. Grant*, 2013 IL 112734, ¶ 11. "The existence of probable cause is an objective determination that must be made on a case-by-case basis and depends upon the totality of the circumstances at the time of the arrest." *People v. Craine*, 2020 IL App (1st) 163403, ¶ 29; see also *District of Columbia v. Wesby*, 583 U.S. 48, 56-7 (2003) ("To determine whether an officer had probable cause for an arrest, we examine the events leading

up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amounts to probable cause.") (Internal quotations and citations omitted.)

¶ 64    "[W]hether probable cause exists is governed by commonplace considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009). Although "[m]ere suspicion" is inadequate to establish probable cause (*People v. Butler*, 2021 IL App (1st) 171400, ¶ 42), probable cause also considers the arresting officer's "training and experience to draw inferences and make deductions that might well elude an untrained person." *People v. Jones*, 215 Ill. 2d 261, 274 (2005). We are also mindful that a probable cause determination is assessed pursuant to "practical considerations instead of technical legal rules." *Butler*, 2021 IL App (1st) 171400, ¶ 49. Further, "probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false*." People v. Wear*, 229 Ill. 2d 545, 564 (2008).

¶ 65    Generally, a search and seizure is unreasonable if it is conducted without a warrant supported by probable cause. *Lomax*, 2012 IL App (1st) 103016 ¶ 28; *McCavitt*, 2021 IL 125550, ¶ 56 (noting that the fourth amendment contains two separate clauses, the reasonableness clause and the warrant clause, with a strong preference for searches conducted pursuant to a warrant). There are, however, some exceptions to the warrant requirement, which are "few in number and carefully delineated." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (quoting *United States v. United States District Court for the Eastern District of Michigan, Southern Division*, 407 U.S. 297, 319 (1972)); see also *Texas v. Brown*, 460 U.S. 730, 735 (1983) (although it is procedurally preferred for law enforcement to procure a warrant, "in a wide range of diverse situations, we have recognized flexible, common-sense exceptions to this requirement."). One such exception is

exigency. *Welsh*, 460 U.S. at 749-50. Relevant here, courts have found the presence of exigent circumstances where police are in "hot pursuit" of a suspect fleeing from a public place into his or her residence. *People v. Wimbley*, 314 Ill. App. 3d 18, 25-6 (2000).

¶ 66     The evidence at both the suppression hearing and the bench trial was that Gonzalez observed defendant with a partially filled beer bottle on the street in Chicago. The inference to be drawn is that defendant was drinking on the public way. Notably, other than Hanen's testimony, which was disbelieved by the trial court, defendant offered no alternative explanation as to why he was holding the bottle. *People v. Gherna*, 203 Ill. 2d 165, 182 (2003) (in assessing a *Terry* stop, observation of a beer bottle, in conjunction with perceived age of defendant, would reasonably lead an officer to have a justifiable basis to assume that underage drinking may be going on). Based on the ordinance and the evidence presented, we hold that there was probable cause to support defendant's arrest.

¶ 67     Further, we find defendant's reliance on *People v. Gaytan* unpersuasive as the facts there are inapposite. 2021 IL App (1st) 192228-U. There, the arresting officers followed the staggering defendants from a bar, believing that *some* offense had been committed, and continued to do so until their beliefs were confirmed by *eventually* seeing a cup of unidentifiable liquid that the officer presumed to be alcohol. *Id.* ¶¶ 7, 27-29. Here, it was the testimony of Gonzalez, who the trial court found credible, that he saw initially saw defendant on the street, holding a partially filled beer bottle, from which he inferred that defendant was drinking in violation of the city's ordinance.

¶ 68     Defendant argues, however, even if we find probable cause based on the ordinance violation, we may still find his arrest to be unconstitutional by looking at the circumstances by which it occurred. We turn to those considerations now.

¶ 69                    2. Hot Pursuit and Retroactivity Concerns

¶ 70    Defendant contends that because the "hot pursuit" doctrine cannot be used to justify the warrantless entry into the home or its curtilage to conduct an arrest for a mere non-violent misdemeanor, the arrest and subsequent search on the steps of his home was unlawful. Defendant asserts that there is no legal distinction in being arrested on the fenced-off stairway of his home from that of an arrest in the home, even if the gate to property was unlocked, as it signaled an intent to exclude Gonzalez from the property. Finally, defendant continues, there were no exigent circumstances or any indication that his conduct posed an imminent danger to public safety, given that Gonzalez admitted to not having any information about him prior to the encounter. Defendant relies almost exclusively on *Lange v. California*, 594 U.S. ___, 210 L.Ed. 2d 18, 141 S. Ct. 2011 (2021), to support his claim, where, according to him, there should be no "residual uncertainty" concerning the outcome of his case following *Lange*.

¶ 71    Briefly, in *Lange*, the United States Supreme Court assessed whether the pursuit of a fleeing misdemeanor suspect categorically qualified as an exigent circumstance. *Id.* at 2016. The court noted that the hot pursuit doctrine had always operated under the assumption that, when a "minor offense alone is involved, police officers do not usually face the kind of emergency that can justify a warrantless home entry." *Id.* at 2020. However, when the facts "[added] a suspect's flight," "the calculus changes[.]" *Id.* at 2021. The court reasoned that "in a great many cases, flight creates a need for police to act swiftly," particularly if a suspect sought to discard evidence or demonstrated a willingness to flee again during the time a warrant was being obtained. *Id.* Nevertheless, the court cautioned, not every case of misdemeanor flight poses such a danger, especially when involving "minor, non-violent conduct." *Id.*  As such, the court stated, "even when a misdemeanant has forced the police to pursue [them] (especially given that 'pursuit' may cover just a few feet of ground)," it may still be necessary for police to obtain a warrant. *Id.* Accordingly,

the court proclaimed that "[w]hen the totality of circumstances shows an emergency—such as imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home—the police may act without waiting." *Id.*

¶ 72     For its part, the State cites *People v. Wear*, 229 Ill. 2d 545 (2008), as dispositive. The State argues that, even if defendant had an expectation of privacy on the "porch," the controlling law at the time of his arrest, *Wear*, categorically allowed for Gonzalez's pursuit of defendant, even for a misdemeanor offense, as the underlying events began in a public place. Further, the State argues, defendant's flight from officers supported their actions to follow him onto the property. Even assuming he did not, the State continues, defendant had no reasonable expectation of privacy on the steps located outside the home, citing, among others, *United States v. Santana*, 427 U.S. 38 (1976).

¶ 73     Defendant makes short shrift of *Wear*, citing to it for the singular purpose of distinguishing the underlying offense there, a misdemeanor DUI offense, from the "mere municipal ordinance violation" in his case. The State does not do substantially better, offering, without citation to authority, only that *Wear* was the law in effect at the time of the arrest, and should therefore govern the outcome of this case.

¶ 74     We briefly summarize *Wear*, a case from our supreme court, which was controlling law at the time of defendant's arrest. In *Wear,* the issue on appeal was whether law enforcement's warrantless and non-consensual entry into the defendant driver's home was excused pursuant to hot pursuit doctrine after law enforcement witnessed the defendant's erratic driving and various traffic violations en route to his home. 229 Ill. 2d at 563. Although the court acknowledged that even with probable cause a warrantless entry into one's home was generally prohibited by the fourth amendment, a warrantless arrest may still be reasonable if it was set in motion in a public

place and the suspected attempted to escape to a private place. *Id.* at 568-69. Further, the court noted, in assessing the reasonableness of the arrest, previous precedent dictated that whether an exigency existed to justify the arrest also included evaluation of the "gravity of the underlying offense for which the arrest is being made." *Id.* at 570**.** The *Wear* court observed that, in Illinois, an offender's first driving under the influence (DUI) offense was a Class A misdemeanor, with the penalty being punishable by up to 364 days in jail, thus indicating that the state's significant interest in deterring intoxicated drivers from being on the road. *Id.* at 569-70.

¶ 75    As noted, when defendant was arrested in 2013, *Wear* was controlling law. Since then, the United States Supreme Court issued *Lange*. Thus, a determination of what decisional law applies, *Lange* or *Wear*, is essential to the disposition of this case.

¶ 76    Defendant's position requires retroactive application of *Lange*. Whether a judicial opinion announcing a new constitutional rule has retroactive effect to cases pending on direct review has a long and storied past, beginning with the landmark case of *Linkletter v. Walker*, 381 U.S. 618 (1965) (holding that whether the new exclusionary rule announced in *Mapp v. Ohio* had retroactive effect was determined by examining the purpose of the new rule, the States' reliance on the prior law, and the effect on the administration of justice of a retroactive application of the new rule)[6]; see also *Desist v. U.S.*, 394 U.S. 244, 249 (1969). However, more than twenty years later, in *Griffith v. Kentucky*, 479 U.S. 314, 321-22 (1987), the high court reconsidered and ultimately rejected the *Linkletter* standard for cases pending on direct review, reasoning that the standard had led to inconsistent and disparate results. Specifically, the *Griffith* court held that "a new rule for

---

[6]*Mapp v. Ohio*, 367 U.S. 643 (1981), held that the State's exclusion of evidence seized in violation of the search and seizure provisions of the Fourth Amendment was required by the Due Process Clause of the Fourteenth Amendment.

the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending in direct review or not yet final[.]" *Id.* at 328. This was based on the court's conclusion that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violate[d] basic norms of constitutional adjudication." *Id.* at 322.

¶ 77 Years later, citing *Griffith* favorably, our supreme court in *People v. Hauschild*, 226 Ill. 2d 63 (2007), observed the "well-established" principle that "judicial opinions announcing new constitutional rules applicable to criminal cases are retroactive to those cases pending on direct review at the time the new rule is announced." *Id.* at 77-8. Our court reasoned that the "failure to apply a new constitutional rule to criminal cases pending on direct review, even when that rule is a 'clear break' [from] the past, violates the basic norms of constitutional adjudication." *Id.* at 78 (quoting *Griffith*, 479 U.S. at 322). Regardless of either party's interpretation of *Wear*, it is clear that *Lange* clarified questions of clear "constitutional dimension" that affect defendant's case here. *Id.* at 78; see also *People v. Erickson*, 117 Ill. 2d 271, 289 (1987) (comparing cases involving rules of "constitutional dimension" with changes that are statutory in nature). Accordingly, we resolve the retroactivity question in defendant's favor and hold that *Lange* applies to the resolution of his appeal.

¶ 78                                4. Curtilage

¶ 79 Significant to our determination of the reasonableness of Gonzalez's conduct is whether the arrest was in an area considered to be within the curtilage of defendant's home. Throughout the record, we observe that the location of defendant's arrest is variously characterized by the parties as either the "porch" or the "steps." A photo depicting the location of defendant's arrest was admitted into evidence and is a part of the record on appeal. The photo reflects what appears to be a two-flat apartment building with a potential basement and third-floor unit. The property is

enclosed by a tall black fence with a gate. Eight to ten steps sit directly behind the fence and lead to a front door. The public sidewalk where defendant was purportedly first spotted directly abuts the property.

¶ 80    The State appears, with minor exception, to accept that the steps leading to defendant's residence were within the curtilage of the home. Indeed, during oral argument, the State expressly conceded that the property upon which Gonzalez was arrested was curtilage and "private space," but otherwise maintained that Gonzalez's authority to arrest commenced on the sidewalk, which could not be thwarted by defendant's retreat to a private place, citing *United States v. Santana*, 427 U.S 38, 43 (1976), in support. Defendant also simply asserts that the steps were a part of the curtilage.

¶ 81    Although not seriously debated by either party, as part and parcel of our analysis, we pause to consider where defendant was searched and arrested after first being spotted on the public way. As noted above, the fourth amendment's protections extend to people, not places, but where the defendant was at the time of arrest informs whether the defendant has established a legitimate expectation of privacy. *Lindsey*, 2020 IL 124289, ¶ 16. That expectation of privacy must be grounded in either formal property rights or informal privacy rights. *Id.*

¶ 82    The leading United States Supreme Court case concerning curtilage around the home is *Florida v. Jardines*, 569 U.S. 1 (2013), which concerned a search of a front porch of a residential property. Therein, the court reiterated the area "immediately surrounding and associated with the home" or its "curtilage" was "part of the home itself" for purposes of the fourth amendment. *Id.* at 6. Significantly, the court noted that the area around the home is "intimately linked to the home, both physically and psychologically," and "where privacy expectations are most heightened." (Internal citations and quotation marks omitted.) *Id.* at 7. Applying these principles to the case

before it, the court further held that the front porch of a single-family residence was "the classic exemplar of an area adjacent to home" where the "activity of home life extends." (Internal quotation marks and citations omitted.) *Id.*

¶ 83     We are mindful that, under *Santana*, even an area considered a private dwelling may still be considered a public place if the area in which the individual is located is still "exposed to public view, speech, hearing, and touch," as if one is "standing completely outside [their] home." *Santana*, 427 U.S. at 42. The "guiding principle is reasonableness, and each case is evaluated based on the totality of the circumstances known to the officers at the time of the warrantless entry." *Id*. Based on the facts before us, including the conduct which set in motion the officers' response, we believe the stairs leading to defendant's residence may properly be characterized as curtilage of the home.

¶ 84     We find our supreme court's decision in *People v. Whitehead*, 2023 IL 128051, ¶ 34, instructive. In assessing another provision within our criminal code, our supreme court decided that the stoop of a home was within the curtilage of a home. The stoop in question was affixed to an apartment complex between two apartment units. In its analysis, it noted that the "commonly understood purpose of a stoop or step in front of a private dwelling is to provide convenient access to a home." *Id*. ¶ 22. However, even if "this convenience may be enjoyed by certain members of the public (such as invited guests or delivery personnel), the convenience is not provided to the public." (Emphasis added.) *Id*. Instead, "[t]he purpose of the stoop is for the owner or resident of the private dwelling to access his or her home" and the "fact that certain members of the public may access it is secondary to the purpose of the stoop." *Id*. Thus, "[t]he stoop in front of a private dwelling—even if that stoop is shared by a neighbor—hardly constitutes a public place." *Id*. ¶ 24. The court reasoned that "expanding the definition of 'public place of accommodation' to include

the stoop, step, or small walkway in front of a private home would amount to an absurd or unjust result." *Id.* Moreover, the court noted, "public accessibility alone, is insufficient to transform a stoop, step, or walkway into a 'place of public accommodation.'" *Id.* ¶ 25.

¶ 85 The court then determined that a stoop is within the curtilage of the home. *Id.* ¶ 34. In reaching its conclusion, the court cited favorably its past decisions in *People v. Bonilla*, 2018 IL 122484 (warrantless sniff by drug-detection dog at threshold of defendant's apartment door in multi-unit complex violated the fourth amendment), and *People v. Burns*, 2016 IL 118973 (third-floor landing outside of an apartment considered curtilage). *Id.*

¶ 86                                   D. Motion to Suppress

¶ 87 With these principles in mind, we return to the record to determine the reasonableness of the events of December 20, 2013. To be clear, it was drinking on the public way that set in motion Gonzalez's pursuit and formed the basis of defendant's arrest. It is against this backdrop that we consider the reasonableness of the pursuit which led to defendant's arrest. We acknowledge that under *Wear*, and on these facts, Gonzalez's pursuit could perhaps pass muster, given that the ordinance violation underlying defendant's arrest began in a public place and ended on what can be considered the curtilage of private property. However, based on the totality of the circumstances, and as assessed today under *Lange*, we conclude that Gonzalez's actions were not reasonable.

¶ 88 As *Lange* explains, "misdemeanors run the gamut of seriousness," ranging from "public intoxication" to domestic violence. 141 S. Ct. at 2020. It is true that the city of Chicago has determined that the crime of drinking on the public way is a misdemeanor jailable offense. *Id.* § 8-4-030(a)(3). Thus, as noted in *Wear*, the public body has attributed a larger degree of seriousness to the crime of public drinking, versus other non-jailable civil offenses. See *Welsh*, 466 U.S. at

754 (categorizing a DUI as a noncriminal, civil offense with no imprisonment penalty). However, when viewing the circumstances of this specific arrest, we still do not see the same "kind of emergency that can justify a warrantless home entry." *Lange*, 141 S. Ct. at 2020. Notably, the misdemeanor offense of drinking on the public way, on its own, is not a "grave offense nor a crime of violence." See *People v. Smock*, 2018 IL App (5th) 140449, ¶ 23 (no probable cause for warrantless entry of home and arrest for misdemeanor disorderly conduct); *People v. Olson*, 112 Ill. App. 3d 20, 24 (1983) (warrantless nonconsensual entry of home was not justified to arrest for nonviolent Class C misdemeanor cannabis conviction).

¶ 89     Of course, we must also consider defendant's retreat into his home. *Lange* expressly noted that a suspect's flight may change the calculus where the police may need to act swiftly. 141 S. Ct. at 2021. Indeed, some courts have said that "an individual's unprovoked flight on seeing police in an area known for crime is suggestive of wrongdoing and may justify police suspecting that individual of criminal activity, which warrants further investigation." *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 19; see also *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000); but see *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 63 ("headlong flight" may be a "pertinent factor" in assessing an officer's suspicion for criminal activity, but on its own does not connote criminal activity.) At the time of initial observation, Gonzalez did not know that defendant lived at the residence into which he retreated after Gonzalez announced his office. However, we must also consider the context of the flight. See *Lange*, 141 S. Ct. at 2022. The evidence depicted a quick and chaotic chain of events where any reasonable person may experience a "noncriminal impulse to avoid interactions with police." *Horton*, 2019 IL App (1st) 142019-B, ¶ 7.

¶ 90     By that same token, *Lange* also counseled that, unless the totality of circumstances shows an emergency, such as through imminent harm to others, a threat to the officer himself, or

destruction of evidence, even if pursuit covers a "few feet of ground," law enforcement might still need to procure a warrant. 141 S. Ct. at 2021. Here, Gonzalez's limited testimony did not indicate any such circumstances. Nothing in the record demonstrated such an emergency beyond, hypothetically, as Gonzalez did not testify to this, defendant's suspected alcohol level possibly dissipating through the passage of time, which the record does not reflect happened after defendant was arrested. See *Welsh*, 466 U.S. at 753-54. Further, it was Gonzalez's own testimony that defendant did not actually run, but instead *walked* behind the gate, which, as shown through the parties' stipulated admission to the photograph of defendant's house, was directly behind the public sidewalk. *People v. Bloxton*, 2020 IL App (1st) 181216, ¶ 21 (even when officer told defendant to stop and defendant continued to walk to the front porch, walking away did not create probable cause). Thus, even Gonzalez's approach, beginning on the public way and then within the property, appears grossly disproportionate to the crime he purportedly observed.[7] *Smock*, 2018 IL App (5th) 140449, ¶ 25 (for misdemeanor offense of disorderly conduct, officers could have simply issued the citation and left); compare *People v. Lake*, 2015 IL App (4th) 130072, ¶ 32 (in assessing whether a seizure occurred, court found that the tapping of defendant's shoulder to question him was "one of many nonoffensive methods our culture and society accept as a measure of common courtesy to attract another person's attention.") Thus, from the outset, even if for a valid reason, his initial encounter with defendant appeared far from peaceable or reasonable,

---

[7]We note defendant's citation to the Chicago Police Department's foot pursuit policy. (May 26, 2021) (Last accessed April 25, 2024) https://home.chicagopolice.org/chicago-police-department-announces-new-foot-pursuit-policy/ (noting that foot pursuits are appropriate only when there is probable cause for an arrest and that tactics should be used to avoid foot pursuit, including "continual communication with a subject and encouraging officers to position themselves in such a way to reduce the opportunity for a foot chase," and "ensuring circumstances involving a foot pursuit are considered before any foot pursuit takes place, [where] officers must ask themselves if the need to apprehend the subject is worth the risk to responding officers, the public, or the subject[.]")

suggesting that he himself created the exigency or circumstances for pursuit that the State attempts to apply here.

¶ 91    Indeed, the State acknowledges that Gonzalez did not explicitly testify to other exigencies at the time of hearing, because according to the State, it was not necessary to elicit that sort of testimony prior to *Lange.* However, the State insists that there was a demonstrated exigency, as defendant had been with Solano, who the officers knew was wanted for a weapons offense. Additionally, the State notes, when Gonzalez caught up to defendant, he refused to remove his arm from a jacket pocket.

¶ 92    Preliminarily, although there appears to be no dispute that officers had a warrant for Solano, any legality to arrest him does not automatically transfer to defendant just because he was with him. See *People v. Surles*, 2011 IL App (1st) 100068, ¶ 29 (without more, no evidence to warrant arrest of passenger in a car whose driver committed a traffic violation that precipitated police encounter); *People v. Lee*, 214 Ill. 2d 476, 485-86 (2005) (neither a defendant's presence in a certain area nor his association with certain people is sufficient for probable cause). Further, it had not been Gonzalez's testimony that he had actually been looking for Solano specifically, only that he had been "looking for somebody in particular with a warrant" in a "high-crime area." Additionally, Gonzalez had no knowledge of *defendant's* background or that he would be likely to flee if apprehended immediately. *People v. Davis*, 398 Ill. App. 3d 940, 949-50 (2010) (even upon allegation of battery, police had no reason to believe that the defendant was armed, that a weapon had been used in underlying offense, or that the defendant had a violent history to justify warrantless entry into the home). Gonzalez also admitted that he had not observed any other activity from either defendant, Solano, or even within the surrounding area that would have required that level of interference, even if he knew it to be a "high-crime" area. Moreover, even a

purported ordinance violation in a "high-crime area" does not justify the intensity of the encounter. See *Surles*, 2011 IL App (1st) 100068, ¶ 38.

¶ 93    Gonzalez also did not explicitly testify to the fact that he feared for his or his fellow officer's safety. It is true that the record reflects defendant failing to comply numerous times with Gonzalez's command to remove his right hand from his jacket pocket.[8] However, Gonzalez did not testify that he feared for his life or the safety of others because he believed defendant to be armed and dangerous; instead, he merely stated that defendant was going to be placed under arrest for drinking on the public way. He also admitted to not noticing anything on defendant's person, either through a bulge or protrusion, that indicated that he could be carrying a weapon. See *Surles*, 2011 IL App (1st) 100068, ¶ 40 (even observation of a bulge in a waistband is not an independent basis for a pat-down search); *People v. Harris*, 2011 IL App (1st) 103382, ¶ 17.

¶ 94    Moreover, even if he had observed something resembling a firearm, Gonzalez still would have had to inquire if defendant had the necessary licenses for it. See *Thomas*, 2019 IL App (1st) 170474, ¶ 40. Indeed, Gonzalez did not learn that defendant did not have a valid FOID Card and was under 21 years of age until he was processing him at the police station, and it is well-established now, and known at the time of arrest, that merely possessing a gun no longer automatically amounts to criminal conduct. See *People v. Aguilar*, 2013 IL 112116, ¶ 20 (opinion issued September 12, 2013, with denial of rehearing December 19, 2013); *Thomas*, 2019 IL App (1st) 170474, ¶ 40; *Bloxton*, 2020 IL App (1st) 181216, ¶ 22; *Horton*, 2019 IL App (1st) 142019-B, ¶ 61. Thus, even with probable cause to arrest for the alcohol ordinance violation, and defendant's arrest occurring in close proximity to that observation, the need to obtain a warrant

---

[8]We further note that Gonzalez's testimony during the suppression hearing and at trial conflicted as to which jacket pocket side defendant's hand was in.

was not obviated without any immediate and clear danger to police or others. See *Davis*, 398 Ill. App. 3d at 949-50.

¶ 95    There is no doubt that, on these facts, an ordinance violation for drinking on the public way is a jailable offense. But even accepting the trial court's credibility determinations as true, Gonzalez's own account of the arrest does not describe an event demanding urgency or action of which ultimately unfolded. *McCavitt*, 2021 IL 125550, ¶ 53 ("[A] reviewing court may undertake its own assessment of the facts as they relate to the issues and may draw its own conclusions when deciding what relief should be granted."). Gonzalez did not testify to any tips or awareness that Solano would be on defendant's property that night that led him to that specific location. Gonzalez did not testify to receiving any 911 calls or witnessing other events in the area to either suggest an exigency or any indication that defendant possessed a firearm. Even if defendant had undisputedly been drinking on a public way, nothing about him possibly retreating into his home indicated to Gonzalez that he posed a further imminent threat. Taking all of these facts together, we cannot find that there were such exigent circumstances as to support a warrantless arrest, rendering it unlawful.

¶ 96                    E. Exclusionary Rule and Good Faith Exception

¶ 97    Having determined that defendant's arrest was unlawful, we next consider whether suppression is the appropriate remedy. Defendant contends that the firearm must be suppressed pursuant to the exclusionary rule, particularly when arrests like his own have been the subject of heightened public scrutiny, citing to a report authored by the Department of Justice, which criticized the CPD's foot pursuit practices which have since been modified.

¶ 98    The State responds that application of the exclusionary rule is inappropriate where the State has met its burden in establishing that Gonzalez had been acting in good faith at the time of arrest.

The State argues that the exclusionary rule should only be applied in "unusual" cases where police conduct is found to be "sufficiently deliberate," whereas here, Gonzalez's conduct was objectively reasonable and supported by binding precedent at the time, citing *People v. Potts*, 2021 IL App (1st) 161219, and *People v. LeFlore*, 2015 IL 116799. Finally, the State concludes, courts should reject applying the exclusionary rule in situations that would encourage bad conduct by criminal defendants, such as encouraging defendants to flee and disobey lawful orders by law enforcement which would run counter to the intent of the exclusionary rule.

¶ 99    In reply, defendant argues that no binding precedent categorically directed that "hot pursuit" could be used to justify an arrest for a municipal ordinance violation, citing *Stanton v. Sims*, 571 U.S. 3 (2013) in support. Further, defendant continues, the State's reliance on *Wear* is misplaced, as the case did not hold that hot pursuit was always authorized, regardless of the seriousness of the offense.

¶ 100   Although there is no constitutional right to have the evidence resulting from an illegal search or seizure suppressed (*LeFlore*, 2015 IL 116799, ¶ 22), "[t]he prime purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." (Internal quotation marks and citations omitted.). *Bonilla*, 2018 IL 122484, ¶ 35. As such, the rule has been limited to situations where "the deterrent purpose[] is 'thought most efficaciously served.' " *People v. Manzo*, 2018 IL 122761, ¶ 62 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

¶ 101   The State's counter to the exclusionary rule is the good faith exception, which is a "judicially created rule providing that evidence obtained in violation of defendant's fourth amendment rights will not be suppressed when police acted with an objectively reasonable good-faith belief that their conduct [was] lawful, or when their conduct involved only simple, isolated

negligence." (Internal quotation marks and citations omitted.) *Bonilla*, 2018 IL 122484, ¶ 35.[9] "The good-faith exception to the exclusionary rule also includes good-faith reliance upon binding appellate precedent that specifically authorized a particular practice but was subsequently overruled." *Id.* ¶ 37; see also *LeFlore*, 2015 IL 116799, ¶¶ 29-31 (adopting the so-called "Davis" expansion of the exclusionary rule). "Thus, in determining whether the good-faith exception applies, a court must ask 'the objectively reasonable question [of] whether a reasonably well trained officer would have known that [the conduct] was illegal in light of all of the circumstances.' " *Leflore*, 2015 IL 116799, ¶ 25 (quoting *People v. Leon*, 468 U.S. 897, 922, n. 23 (1984). Overall, "the deterrent benefit of suppression must outweigh the substantial social costs in order for the exclusion to apply." (Internal quotations and citations omitted.) *Manzo*, 2018 IL 122761, ¶ 64. "Whether the good faith exception to the exclusionary rule applies presents a legal question that we review *de novo.*" *Id.* ¶ 67.

¶ 102   Much of the State's argument throughout its brief is that, at the time defendant was arrested, existing Illinois law categorically allowed for officers to engage in hot pursuit even for misdemeanor offenses like drinking on the public way. As noted prior, we have already found *Lange* to retroactively apply to the circumstances of defendant's arrest, where *Lange* re-emphasized the concept of *reasonableness* in warrantless arrests involving hot pursuit. Here, on balance, Gonzalez's encounter with defendant was not objectively reasonable, based on the "nature of the crime, the nature of flight, and surrounding facts" that presented no such exigency, such as

---

[9]Although not cited to by the parties, the good-faith exception has also been codified in section 114-12(b)(1) of the Code of Criminal Procedure of 1963. 725 ILCS 5/114-12(b)(1), (2) (West 2012); *Manzo*, 2018 IL 122761, ¶ 63.

imminent harm of violence, destruction of evidence, or escape from the home, to excuse the warrant requirement. *Lange*, 141 S. Ct. at 2021, 2022.

¶ 103    However, we would still find Gonzalez's conduct to be unreasonable even under controlling law at the time of defendant's arrest. Even accepting the State's argument that *Wear* categorically allowed for hot pursuit of misdemeanor offenses without a warrant, it does not eviscerate the reasonableness requirement underlying warrantless arrests and searches, which are always assessed by the totality of the circumstances. See *Davis v. United States*, 564 U.S. 229, 241 (2011) ("[W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities.") (Emphasis theirs.) Moreover, even *Wear* recognized that "an important factor to be considered when determining whether any exigency exists is the *gravity of the underlying offense*," which provided the "best indication of the State's interest in precipitating the arrest." (Emphasis added.) *Wear*, 229 Ill. 2d at 570. Thus, we cannot find that the good-faith exception applies here, as it is meant only to be a refuge for "objectively reasonable law enforcement activity." *Davis*, 564 U.S. at 241.

¶ 104    In sum, we conclude that the firearm recovered from defendant was obtained pursuant to an unlawful search, and as such conclude on these facts that the trial court's denial of the motion to suppress was in error. See *Horton*, 2019 IL App (1st) 142019-B, ¶ 8. Further, because we also find that the sole piece of evidence connecting defendant to his AUUW convictions must be excluded, we also must conclude that the evidence supporting his convictions is insufficient and the State cannot support its burden of reasonable doubt. Accordingly, we reverse defendant's conviction without remand. *People v. Williams*, 2020 IL App (1st) 172992, ¶ 12; *Surles*, 2011 IL App (1st) 100068, ¶ 42.

¶ 105                    F. Second Amendment Challenges

¶ 106   Having determined that defendant's warrantless arrest, although supported by probable cause, was unreasonable, we need not address defendant's second challenge, namely whether, under the United States Supreme Court's most recent decision in *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. 1 (2022), Illinois' prohibitions on both handgun possession and issuance of a FOID card for those under the age of 21 years old is unconstitutional.

¶ 1                          III. CONCLUSION

¶ 2      For the reasons stated, we reverse the judgment of the circuit court.

¶ 3      Reversed.